**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **MARLON TOLLIVER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:22-cv-1613-AMM** |
| | ) |
| **CITY OF BIRMINGHAM,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION ON DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT**

This case is before the court on a motion for summary judgment filed by

defendant City of Birmingham ("the City"). Doc. 29. For the reasons stated below,

the motion is **GRANTED**.

## I.    BACKGROUND

Marlon Tolliver, a Black male, has been employed at the Birmingham Police

Department ("the Department") since 2009. Doc. 36 ¶¶ 1, 3; Doc. 28-1 at 26. In

2019, he was promoted to the rank of sergeant, the position in which he currently

serves. Doc. 36 ¶ 4; Doc. 28-1 at 27. In 2022, Mr. Tolliver applied for a promotion

to the rank of lieutenant, but he was disqualified because of outstanding disciplinary

matters. *See* Doc. 28-1 at 205. That disqualification is the basis for this lawsuit.

In 2022, eight lieutenant positions became available at the Department. Doc. 28-2 at 46, 53. Sergeant Tolliver applied for a promotion, and the Jefferson County Personnel Board certified him as an eligible candidate. *See id.* at 24–25, 47–48, 75.

The promotional process then proceeded as follows: Interviews occurred in January of 2022, and applicants were required to submit "Personal Accomplishment Workbooks" by June 6, 2022. *Id.* at 51–52, 85, 107. After the submission of the Personal Accomplishment Workbooks, they received a score by which they were ranked for final consideration for available promotions. *See id.* at 26–27, 109–10, 122.

Ultimately, Sergeant Tolliver tied for the third in the list of eligible candidates. Doc. 28-1 at 221; *see id.* at 85. But his application was put "on hold" due to outstanding disciplinary matters. *Id.* at 221.

The Department's promotion guide states that disciplinary matters, even suspensions or disciplinary decisions that have been reversed or reduced, may disqualify a candidate from receiving a promotion. *See* Doc. 28-2 at 34–35, 43–44; Doc. 28-1 at 208. The guide states:

> The disciplinary history of all candidates will be evaluated. Candidates for Police Lieutenant that have received fifteen (15) or more days of suspension within the last 24 months, from **May 16, 2020 to May 16, 2022**, will not be eligible for promotion and will be removed from the candidate pool.

> If the candidate has an active appeal that if reversed will qualify them for promotion, the candidate will be allowed to proceed to the next phase but will not be eligible for promotion until the results of the appeal are issued. Therefore, the eligibility for promotion may only be predicated on the overturning of the suspension during the appeal process.
>
> **Conduct prior to the final promotional selections can result in disqualification from the process.**
>
> . . . .
>
> Discipline or misconduct that occurs or is issued **<u>at any point</u>** after the process begins including after scores and ranks have been issued, will also be considered prior to a candidate's final selection for promotion.

Doc. 28-2 at 116; *see id.* at 122–23.

Tina Moorer, the City of Birmingham's corporate representative, *id.* at 45–46, testified that a candidate with pending disciplinary proceedings may proceed in the promotional process, but that the candidate may still be ineligible for the promotion based on the outcome of those proceedings, *id.* at 36. She testified that "whether [a] person is eligible for promotion . . . [will not] be determined until the outcome of [a] pending [disciplinary] process is resolved" and that she has "never seen anyone awarded a promotion when they had a process pending." *Id.*

She also testified that the promotional process is not always held in abeyance while an otherwise-eligible applicant's disciplinary proceeding is resolved; instead, whether the promotional process is paused depends "on the needs of the

3

Department." *Id.* at 37. Therefore, if the Department needed to fill the position, the next eligible candidate would receive the promotion. *See id.* at 37, 42. Ms. Moorer testified that she has never seen the promotional process held in abeyance until a candidate's disciplinary proceeding was resolved. *Id.* at 37.

The facts giving rise to Sergeant Tolliver's disciplinary proceedings are these: On April 29, 2022, Sergeant Tolliver did not go to a scene of an accident because the officer on the scene reported that the injuries were not life-threatening. Doc. 28-1 at 54–55; *see id.* at 192. Lieutenant John Green, a Black male, Doc. 36 ¶ 16, provided then-Chief of Police Scott Thurmond, a white male, *id.* ¶ 17, the information about Sergeant Tolliver's failure to go to the scene that began an investigation by the Department's Internal Affairs Division, Doc. 28-3 at 2; *see* Doc. 28-1 at 192. Sergeant Tolliver was written up for (1) "fail[ing] to respond to an incident involving six Birmingham Police units that responded to a multi-vehicle wreck with serious injuries to pedestrian bystanders and extensive property damage"; (2) "fail[ing] to take command of [the] incident"; (3) "fail[ing] to coordinate assistance for the primary Birmingham Police unit that responded to" the scene; and (4) "fail[ing] to notify a superior officer concerning an unusual event . . . in which six Birmingham Police units responded" to the scene. Doc. 28-1 at 192.

Sergeant Tolliver contested the write-up, stating that he was "not required to respond [to the scene] unless the injuries are life-threatening or [there is] a fatality."

4

*Id.* at 204. He testified that Sergeant Demarcus Brown, a Black male who was also on duty on that evening, did not go to the scene, but Sergeant Brown "was[ not] up for promotion" and did not receive discipline. *Id.* at 56–57, 59–60. He also complained that sergeants for the Internal Affairs Division are required to go "to [a] scene if there is injury, $500 or more [in] damage, and a city police department vehicle is involved," *id.* at 204, and that a former white Internal Affairs Division investigator was not disciplined for "fail[ing] to respond to a traffic accident fatality involving a Birmingham Police Department Vehicle as Policy stated," *id.* at 133, 178–79; Doc. 36 ¶¶ 37–42.

On May 9, 2022, Sergeant Tolliver responded to a call about an individual who fired shots at a tow truck. Doc. 28-1 at 46–47, 185, 211. While on scene, Sergeant Tolliver spoke on a radio call with Lieutenant Katherine Snider, a white female, Doc. 36 ¶ 16, who wanted the officers to arrest the individual who fired the shots, Doc. 28-1 at 46–47. Because of confusion about whether the driver of the tow truck was stealing the individual's car, Sergeant Tolliver "asked . . . questions" while on the call with Lieutenant Snider. *See* Doc. 28-1 at 46–49. Sergeant Tolliver believed that Lieutenant Snider "had a problem" with his questions and was "rude and disrespectful" towards him on the call. *Id.* at 38, 41.

Lieutenant Snider directed Sergeant Tolliver to meet with her when he got back to the precinct. *Id.* at 38. Sergeant Tolliver told Lieutenant Snider "that [he] did

not feel comfortable meeting with her unless the captain was present." *Id.* But Lieutenant Snider did not wait for a captain and spoke with Sergeant Tolliver, who brought Sergeant Ronald Brown as a witness, when he arrived at the precinct. *Id.* at 38, 43–45. Both parties "aired [their] differences" at the meeting. *Id.* at 45.

The next day, on May 10, 2022, Sergeant Tolliver emailed Captain Julie Quigley-Vining, a white female, Doc. 36 ¶ 16, complaining that "[t]he situation is becoming almost hostile" because Lieutenant Snider "is a very rude, disrespectful, and unprofessional Lieutenant." Doc. 28-1 at 185. Captain Quigley-Vining did not respond to the email. *Id.* at 39.

On May 11, 2022, Sergeant Tolliver reported for duty at 9:00 PM. *See id.* at 48, 187. He spent the night patrolling and responding to calls, and he arrived back to the precinct around 4:15 AM. *Id.* at 48–49. When he arrived at the precinct, he "logged on the computer," "checked some reports," and went into his office. *Id.* at 49–50. Then, he "closed the door," "turned the TV on," "turned the lights off," and "sat back in the chair and took . . . a break." *Id.* at 50. After approximately twenty-minutes, Captain Quigley-Vining opened the door, shined a flashlight in his face and said, "Oh, you're asleep." *Id.* at 50–51. Sergeant Tolliver told Captain Quigley-Vining that he was not. *Id.* at 50. Sergeant Tolliver was written up for (1) "neglect[ing] his duty when he was found to be loafing in the East Precinct" by Captain Quigley-Vining and (2) "admit[ting] to Captain . . . Quigley-Vining that he

6

had been asleep in the East Precinct Delta shift office prior to her finding the door locked." *Id.* at 187.

On May 23, 2022, Sergeant Tolliver received a five-day suspension from Chief Thurmond for failing to secure a residence after making an arrest in May 2021. *Id.* at 196–97; *see id.* at 67. The suspension arose out of an incident in which Sergeant Tolliver left the door to an arrestee's home unlocked and the arrestee later complained that her home had been broken into. *Id.* at 63–65. Sergeant Tolliver testified that officers at the Internal Affairs Division "held the write-up" for approximately one year until they learned that he was a candidate for a promotion to lieutenant. *Id.* at 66. Sergeant Tolliver appealed the suspension to Jill Madajczyk, the Chief Human Resources Officer, who ultimately upheld it. *See id.* at 68, 91. Sergeant Tolliver concedes that this discipline did not impact his opportunity for a promotion. *See* Doc. 38 at 3.

On June 13, 2022, Sergeant Tolliver received an email notifying him that he tied for third in the list of eligible candidates (and therefore was within the range of being promoted to lieutenant). Doc. 28-1 at 221; *see id.* at 85. But the notice also informed him that his application had been put "on hold" because of outstanding disciplinary matters. Doc. 28-1 at 221; *see id.* at 85. Sergeant Tolliver was "unaware" of those matters at the time. *Id.* at 85.

Chief Thurmond, "the ultimate decisionmaker for all disciplines" and "for the summer 2022 Police Lieutenant promotions," testified that, after becoming aware of Sergeant Tolliver's "multiple possible disciplinary issues under investigation by [the Internal Affairs Division]," he "determined that the top seven individuals, not considering [Sergeant] Tolliver, would be promoted and the last vacancy would be placed on hold." Doc. 28-3 at 1–3.

On June 15, 2022, Sergeant Tolliver appealed the hold on his promotion, stating that "[t]he disciplinary issues were put on [him] out of retaliation from a previous incident." Doc. 28-1 at 207. That same day, Sergeant Tolliver also filed a complaint with the City's Human Resources Department against Lieutenant Snider and Captain Quigley-Vining for retaliation, bullying/intimidation, discrimination, harassment, and a promotion dispute. *Id.* at 210.

On July 20, 2022, Sergeant Tolliver filed another complaint with the City's Human Resources Department against Chief Thurmond, Deputy Chief Ronald Sellers, Captain Quigley-Vining, and Lieutenant Green for retaliation, harassment, and a promotion dispute. *Id.* at 199.

On July 25, 2022, "based on the outcome of [the Internal Affairs Division's] investigations," Chief Thurmond issued discipline to Sergeant Tolliver. Doc. 28-3 at 3; *see* Doc. 28-1 at 188, 193. Chief Thurmond suspended Sergeant Tolliver for twenty-five days for failing to respond to the scene of the accident on April 29, 2022.

Doc. 28-1 at 192–93. And he suspended Sergeant Tolliver for ten days for admitting to Captain Quigley-Vining that he had been sleeping, although he did not sustain the allegation that Sergeant Tolliver neglected his duty while loafing in the precinct. *Id.* at 187–88. Sergeant Tolliver appealed those suspensions. *See id.* at 53, 62.

Based on the suspensions, Chief Thurmond determined "that [Sergeant] Tolliver should be disqualified from the promotional process and the next highest scoring individual should be promoted." Doc. 28-3 at 3. Of the eight sergeants who were promoted to lieutenants, four were Black and four were white. Doc. 28-1 at 99, 104–05.

On July 28, 2022, Sergeant Tolliver received an email from Robbie Martin, the employee relations manager, stating that the temporary hold placed on his promotion had been removed. *Id.* at 205–06. Ms. Martin informed Sergeant Tolliver that the number of suspended days he received disqualified him from eligibility for a promotion. *Id.* at 205.

On July 30, 2022, Sergeant Tolliver appealed his disqualification. *Id.* at 209; *see id.* at 85. He stated that he believed that he "was targeted for disqualification by [the Department's] leadership." *Id.* at 209. On August 11, 2022, Ms. Martin informed Sergeant Tolliver that his appeal was denied. *Id.* at 208. She stated that (1) the discipline Sergeant Tolliver received during the promotional process "disqualified [him] from moving forward," (2) his "disqualification was appropriate

based on the [Department's] promotion guidelines, and [(3) he was] not treated differently than other candidates." *Id.*

Sergeant Tolliver's disciplinary appeals were not resolved until after the lieutenant promotional process had been completed. Doc. 28-2 at 59. In January or February 2023, the Jefferson County Personnel Board conducted hearings on Sergeant Tolliver's appeals. Doc. 28-1 at 16. Ultimately, Chief Thurmond's twenty-five-day suspension for failing to respond to a scene on April 29, 2022, was reduced to five days with a letter of counseling, and Sergeant Tolliver received back pay for those twenty days. *Id.* at 62–63. The ten-day suspension for loafing on May 11, 2022, was overturned, and Sergeant Tolliver received backpay for those ten days. *Id.* at 53.

Sergeant Tolliver believes that he did not receive the promotion because of his race. *See id.* at 97. He testified that "[b]ased on [his] many interactions with [Lieutenant] Snider, [he] came to understand that she held racial animosity towards [him] as an African-American male[]" because she "often hounded [him] for no reason and spoke to [him] in a demeaning and derogatory fashion." Doc. 36 ¶¶ 18–19. He testified that he "never observed her treat white officers this way." *Id.* ¶ 19. When asked why he believed "that Lieutenant Snider has a problem with [B]lack officers," Sergeant Tolliver testified: "She has a problem with me. As a [B]lack male, she has a problem with me. I can[not] speak on other [B]lack officers, but she

10

has a problem with me. . . . [S]he just never liked me. She always hounded me for no reason whatsoever." Doc. 28-1 at 37–38.

Sergeant Tolliver also testified that Chief Thurmond, Captain Quigley-Vining, Lieutenant Snider, and Deputy Chief Sellers never made any race-based statements to him, he never heard them use racial slurs, and he had never seen them make any sort of racially offensive symbols. *Id.* at 32–35. But he testified that Captain Quigley-Vining "has been accused of making" racial slurs, that she has a history of mistreating Black males, and that the City had to pay money to settle a lawsuit based on Captain Quigley-Vining's conduct. *Id.* at 32, 81. He later testified that he did not know if the City paid any money from the lawsuit and that he only heard of the lawsuit through "rumors from around the department." *Id.* at 82.

Chief Thurmond testified that neither Captain Quigley-Vining nor Lieutenant Snider had any involvement in the promotional process at issue in this litigation. Doc. 28-2 at 56; Doc. 28-3 at 2.

Sergeant Tolliver believes that Chief Thurmond, Deputy Chief Sellers, Captain Quigley-Vining, and Lieutenant Snider conspired to discipline him for "nonsense" so that he would be disqualified from the promotion. Doc. 28-1 at 125–26. Sergeant Tolliver testified that the Department's leadership did not hold a lieutenant spot open for him while his appeal of his disciplinary action was pending, which he says is evidence of its intent to hinder his promotion, and he believes that

his disciplinary matters should not have prevented him from being promoted until his appeal of the suspensions had been completed. *See id.* at 124, 132. But he also testified that he had never known of a promotion to be put on hold until an applicant's disciplinary matter was "sorted out." *Id.* at 131.

Sergeant Tolliver also believes that Chief Thurmond, Deputy Chief Sellers, Captain Quigley-Vining, and Lieutenant Snider "conspired" with Ronald Harless—a white male who received a promotion to lieutenant—to discipline him so that Lieutenant Harless would get promoted. *Id.* at 126; *see id.* at 97; Doc. 28-2 at 134. Sergeant Tolliver was tied for the third highest rank on the promotion list. Doc. 28-2 at 57; *id.* at 2. The Department's evidence indicates that Lieutenant Harless was ranked fourth. Doc. 28-2 at 57, 134; Doc. 36 at 14. Ms. Moorer testified that because there were eight open lieutenant positions, Lieutenant Harless would have been promoted regardless of Sergeant Tolliver's disqualification. Doc. 28-2 at 57. She testified that another candidate, James Littleton, was the individual who received a promotion because of Sergeant Tolliver's disqualification. *Id.* at 54.

Sergeant Tolliver disputed that Lieutenant Harless was ranked fourth based on "rumors" from "third parties." Doc. 28-1 at 97–98. He testified that he believed that Lieutenant Harless was ranked ninth—meaning he received the promotion only once Sergeant Tolliver was disqualified—based on "hearsay." *Id.* at 128.

Sergeant Tolliver also testified that he believed Lieutenant Harless had a disciplinary proceeding ongoing during the promotion process, but stated that he could not "verify that" and heard it from a "third party"—namely, "[p]eople just talking throughout the precincts and around the department." *Id.* at 101. At the time of his deposition, he did not recall a specific individual who told him about a disciplinary proceeding involving Lieutenant Harless. *Id.* He also testified that if Internal Affairs Division records did not reflect that Lieutenant Harless had a disciplinary matter pending, it was because "[t]hey probably got rid of it," although he did not "have any evidence." *Id.* at 101–02. He later testified that he did not know if any of the sergeants who were promoted to lieutenant had pending disciplinary proceedings. *Id.* at 105.

Ms. Moorer testified that, to her knowledge, no other candidate for the lieutenant promotion besides Sergeant Tolliver had a pending disciplinary matter in 2022. Doc. 28-2 at 57–58. Chief Thurmond testified that he reviewed the City of Birmingham's records and "certif[ied] that no candidate for the summer 2022 Police Lieutenant promotion, other than Marlon Tolliver, had any pending disciplinary actions or any open [Internal Affairs Division] investigations pending." Doc. 28-3 at 4.

Sergeant Tolliver also believes that he was retaliated against for filing complaints with the City's Human Resources Department. Doc. 28-1 at 69. But he

testified that Chief Thurmond did not make any retaliatory statements to him, or ever reference his complaints. *Id.* at 92.

Sergeant Tolliver filed a complaint with the Equal Employment Opportunity Commission, Doc. 1-1 at 1–2; Doc. 28-1 at 20, and he received a right-to-sue letter, Doc. 1-2 at 1–2. Sergeant Tolliver sued the City for discriminating against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. §§ 1981 and 1983. Doc. 1.

The City of Birmingham moved for summary judgment. Doc. 29. The motion is fully briefed. Docs. 38–39.

## II.    LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether the movant has met this burden, courts must view the evidence in the light most favorable to the non-movant." *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). Courts "do not weigh conflicting evidence or make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016).  "Summary judgment must be granted if the nonmoving party has 'failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *Rink v. Cheminova, Inc.*, 400

F.3d 1286, 1294 (11th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## III. ANALYSIS

### A. Claims Made Under 42 U.S.C. §§ 1981 and 1983 (Counts B and C)

The City argues that Sergeant Tolliver's claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 fail because he did not "establish municipal liability under [Section] 1983." Doc. 30 at 26. It argues that a municipality may be held liable under Sections 1981 and 1983 only where the plaintiff establishes a policy or custom that gives rise to the violation and that Sergeant Tolliver has not demonstrated such a policy or custom in this case. *Id.*

Sergeant Tolliver does not respond to this argument. Failing to respond to an argument on summary judgment indicates that the argument is unopposed. *See Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001); *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim[,] or defense is unopposed." (cleaned up)).

In any event, "[i]t is well established that a municipality may be held liable under [Section] 1983 only when the deprivation at issue was undertaken pursuant to city 'custom' or 'policy,' and not simply on the basis of *respondeat superior*." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991). Sergeant

Tolliver has not presented any evidence of a policy or custom of discrimination in the City's promotional process. Indeed, Sergeant Tolliver testified that he was not challenging the City's promotional process in this lawsuit. *See* Doc. 28-1 at 88–91.

Accordingly, the City's motion for summary judgment is **GRANTED** as to Counts B and C, which are claims made under Sections 1981 and 1983.

### B. Intentional Racial Discrimination (Count A)

The City argues that Sergeant Tolliver has failed to prove causation for his racial discrimination claims because he "has pointed to no evidence from which a discriminatory intent can be inferred" for Chief Thurmond's disciplinary decisions sufficient for the claims to survive summary judgment. Doc. 30 at 22–23. It also argues that Sergeant Tolliver cannot proceed under a "cat's paw" theory because (1) he failed to establish discriminatory animus by Lieutenant Snider or Captain Quigley-Vining and (2) Chief Thurmond testified that he made his disciplinary decisions on the basis of Internal Affairs Division investigations. Doc. 39 at 7–8. It also argues that Sergeant Tolliver "abandoned any claim" based on the *McDonnell Douglas* burden shifting analysis or mixed-motive analysis because he did not respond to its arguments about those theories in his opposition to summary judgment. *Id.* at 7.

Sergeant Tolliver argues that he has presented a convincing mosaic of evidence sufficient for a jury to infer that race was a motivating factor in his

disqualification from the lieutenant promotion. Doc. 38 at 18–20. He relies on his testimony that Lieutenant Snider and Captain Quigley-Vining "regularly treated him and other African-American males in a discriminatory fashion" and that Captain "Quigley-Vining had used racial slurs in the past" to support an inference that they held a racial animus that may be imputed to Chief Thurmond under a "cat's paw" theory. *Id.* at 19–20.

In Count A, Sergeant Tolliver brings his claim of racial discrimination against the City under Title VII of the Civil Rights Act of 1964. Doc. 1 at 6–7. "Title VII of the Civil Rights Act of 1964 outlaws employment discrimination because of 'race, color, religion, sex, or national origin.'" *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943 (11th Cir. 2023) (quoting 42 U.S.C. § 2000e-2(a)(1)). "To prove a claim under [Title VII], a plaintiff can use direct evidence, circumstantial evidence, or both." *Tynes*, 88 F.4th at 944.

"In order to survive summary judgment, a plaintiff alleging intentional discrimination [under Title VII] must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019). "One way that she can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas*" for single-motive cases. *Id*. "A plaintiff can also present direct evidence of discriminatory intent, . . . or demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination .

. . ." *Id.* at 1220 n.6. Additionally, an "employee can succeed on a mixed-motive claim [under Title VII] by showing that illegal bias[] . . . 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quoting 42 U.S.C. § 2000e-2(m)).

### 1. Sergeant Tolliver did not argue racial discrimination based on direct evidence or the *McDonnell Douglas* framework.

Sergeant Tolliver did not argue that he has (1) direct evidence of discrimination or (2) sufficient evidence of discrimination under the *McDonnell Douglas* evidentiary framework. The court therefore does not address those theories. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

### 2. Sergeant Tolliver's racial discrimination claim does not survive summary judgment on a convincing mosaic theory.

"[A] 'convincing mosaic' is a metaphor, not a legal test and not a framework." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023). "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action— the ultimate inquiry in a discrimination lawsuit." *Tynes*, 88 F.4th at 946.

"[A] plaintiff may establish a convincing mosaic with evidence of (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better

18

treatment of similarly-situated employees; and (3) that the employer's justification is pretextual." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1337 (11th Cir. 2024) (cleaned up). "Employees are not limited in the kinds of circumstantial evidence they may present." *Berry*, 84 F.4th at 1311.

Most of the evidence Sergeant Tolliver relies on for his "mosaic" is inadmissible hearsay. "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir.1999) (cleaned up). "Nevertheless, a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (cleaned up).

Sergeant Tolliver's testimony that (1) Ronald Harless was ranked ninth, not fourth, in the list of eligible candidates for a lieutenant promotion, (2) Ronald Harless had a pending disciplinary proceeding at the time of the 2022 lieutenant promotions, and (3) the City paid money to a litigant because of Captain Quigley-Vining's mistreatment of Black males are based on "rumors" from "third parties." *See* Doc. 28-1 at 82, 101, 128. Sergeant Tolliver did not identify a basis for these statements—such as the declarant who made them—sufficient to render the evidence

potentially admissible at trial. Therefore, none of this testimony may be considered on summary judgment. *See Jones*, 683 F.3d at 1293–94.

Similarly, Sergeant Tolliver testified that he did not "have any evidence" supporting his statement that Chief Thurmond, and presumably others, "got rid" of Lieutenant Harless's disciplinary write-ups to help him get promoted to lieutenant. *See* Doc. 28-1 at 82, 101–02, 128. Such speculation is insufficient to create a jury question. *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1017 (11th Cir. 2023) ("[I]nferences in favor of a plaintiff [in a race discrimination claim] can be based only on evidence—not on speculation." (cleaned up)).

The remaining testimony falls short of creating anything resembling a convincing mosaic of discrimination. Initially, the court addresses Sergeant Tolliver's argument that the court should "disregard[]" Chief Thurmond and Ms. Moorer's testimony because they are "interested witness[es] whose credibility on this and other material facts is at issue in this case." Doc. 38 at 7–9 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000); and then citing *Hinson v. Clinch Cnty.*, 231 F.3d 821 (11th Cir. 2000)). In *Reeves*, the Supreme Court stated that when ruling on a summary judgment motion, "the court must review the record taken as a whole." *Reeves*, 530 U.S. at 150 (cleaned up). The Supreme Court clarified that a court should "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. But that case involved a plaintiff who

"made a substantial showing that [the defendant's] explanation [for terminating the plaintiff's employment] was false." *Id.* at 144. Such evidence is not present here—Sergeant Tolliver attempts to contradict Chief Thurmond or Ms. Moorer's testimony with nothing but his own speculation. Chief Thurmond and Ms. Moorer's testimony is therefore effectively unopposed.

The evidence demonstrates that Chief Thurmond alone was responsible for disciplinary proceedings within the Department, Doc. 28-3 at 1–2; Doc. 28-2 at 42, and Sergeant Tolliver has not presented any admissible evidence suggesting that Chief Thurmond has racial animus towards Black individuals. And although Sergeant Tolliver testified that Chief Thurmond "conspired" with Lieutenant Snider and Captain Quigley-Vining to get Mr. Harless promoted over him, Doc. 28-1 at 126, he has not presented any evidence of such a conspiracy.

Instead, in his opposition to summary judgment, Sergeant Tolliver relies on a "cat's paw" theory. *See* Doc. 38 at 19–20. "A plaintiff in a 'cat's paw' case typically seeks to hold the plaintiff's employer liable for the animus of a supervisor who was not charged with making the ultimate adverse employment decision." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021) (cleaned up).

"Under a 'cat's paw' theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct."

*Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008) (cleaned up). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* (cleaned up).

"[C]at's paw liability is appropriate only when a person took some sort of action—for example, making a termination recommendation—that led to the adverse action against the plaintiff." *Griffin v. City of Jacksonville*, 762 F. App'x 965, 972 (11th Cir. 2019). The supervisor must be the person with "the power to make official decisions and, thus, be held *individually* liable" for those decisions. *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003). "[T]his causation must be truly direct," and "the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's" adverse employment decision. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999).

Sergeant Tolliver argues that Lieutenant Snider and Captain Quigley-Vining acted with racial animus whenever they reported the conduct that led to the suspensions that disqualified him from the promotional process. *See* Doc. 38 at 18–19. In support of that claim, he testified that two other individuals failed to report to the scene of an accident and were not disciplined—but at least one of those was a Black sergeant, suggesting that race was not at play in the officers' write-ups for

Sergeant Tolliver. Doc. 28-1 at 56–60. The other, unlike Sergeant Tolliver, "worked directly for Chief Thurmond" as an investigator for the Internal Affairs Division, the officers of which, based on Sergeant Tolliver's complaint, are subject to different standards. Doc. 36 ¶¶ 37–42; Doc. 28-1 at 133, 204, 212 (indicating that Sergeant Tolliver was not required to respond to the scene on April 29, 2022, but that sergeants for the Internal Affairs Division must respond "to the scene if there is injury").

Sergeant Tolliver also argues that Captain Quigley-Vining and Lieutenant Snider wrote him up with baseless allegations to hinder his promotional opportunity. *See* Doc. 38 at 19. But as it relates to at least one of them—loafing—Sergeant Tolliver admits that at the time Captain Quigley-Vining entered his office, he was taking a break with the door shut, lights off, and TV on. Doc. 28-1 at 50.

In any event, Sergeant Tolliver also testified that Lieutenant Snider "held racial animosity towards [him] as an African-American male," Doc. 36 ¶ 18, and he testified that Captain Quigley-Vining has been accused of making racial slurs, Doc. 28-1 at 32–33. Even assuming arguendo that this evidence is sufficient to create a jury question regarding whether Lieutenant Snider and Captain Quigley-Vining harbored racial animus, Sergeant Tolliver's claim still fails because he failed to show that Chief Thurmond disciplined, and thus disqualified, him "because of" his race. *See* 42 U.S.C. § 2000e–2. More particularly, Sergeant Tolliver has not presented

evidence sufficient to create a jury question on the question whether any discriminatory animus held by Lieutenant Snider or Captain Quigley-Vining was the actual cause of Chief Thurmond's decision to discipline him and "not the underlying employee misconduct identified in the" write-ups. *Stimpson*, 186 F.3d at 1331.

Chief Thurmond testified that he based his disciplinary and disqualification decisions on the results of independent Internal Affairs Division investigations. Doc. 28-3 at 3. And the evidence reflects that Chief Thurmond did not merely rubber stamp Lieutenant Snider and Captain Quigley-Vining's write ups. Indeed, Chief Thurmond did not sustain one of Captain Quigley-Vining's allegations. *See* Doc. 28-1 at 188. Therefore, Sergeant Tolliver has failed to prove cat's paw liability. *See Stimpson*, 186 F.3d at 1332 (concluding that a plaintiff did not prove cat's paw liability where she did not present evidence indicating that the decisionmaker acted as a "rubber stamp" on a recommendation by an employee with alleged racial animus).

Accordingly, Sergeant Tolliver has failed to present a convincing mosaic that the City discriminated against him on the basis of his race.

### 3. Sergeant Tolliver's racial discrimination claim does not survive summary judgment on a mixed-motive theory.

The City argues that Sergeant Tolliver failed to respond to its mixed-motive arguments and therefore abandoned any claim based on that theory. *See* Doc. 39 at 7. In his opposition to summary judgment, Sergeant Tolliver conflates a convincing

mosaic analysis with a mixed-motive analysis, but he argues that he presented evidence that would "allow[] a jury to infer that race discrimination was a motivating factor in his disqualification from the promotional process." Doc. 38 at 18. The court therefore addresses whether there is a jury question regarding the City's potential liability under this theory.

A plaintiff asserting a Title VII claim under a mixed-motive theory must offer "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff and; (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1327 (11th Cir. 2023) (cleaned up). At the summary-judgment stage, "the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision." *Quigg*, 814 F.3d at 1239 (cleaned up).

For many of the reasons explained above, Sergeant Tolliver has not presented evidence sufficient for a reasonable jury to conclude that race was a motivating factor for his disqualification. In his opposition to summary judgment, Sergeant Tolliver's only argument that racial animus was a motivating factor in his disqualification is the cat's paw theory described earlier. *See* Doc. 38 at 18–20. But

for the reasons explained above, there is no evidence that Chief Thurmond acted as the cat's paw for Lieutenant Snider and Captain Quigley-Vining.

Accordingly, Sergeant Tolliver does not offer "enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action— the ultimate inquiry in a discrimination lawsuit." *Tynes*, 88 F.4th at 946. The City's motion for summary judgment on the claim of intentional discrimination in Count A is therefore **GRANTED**.

### C. Retaliation

Sergeant Tolliver asserts a retaliation claim by that name only in Count C, which the court already has discussed. Even assuming he intended Count A (his Title VII claim) also to allege retaliation, the City is entitled to summary judgment on that claim. The City argues that Sergeant Tolliver failed to prove the causation element of a Title VII retaliation claim because (1) he "failed to show that Chief Thurmond, the decision maker[,] was aware of [Sergeant Tolliver's] protected conduct before he made the decision to discipline him" and (2) "Chief Thurmond had already made the decision to place [Sergeant] Tolliver's promotion 'on hold' prior to [his] first protected activity. . . ." Doc. 30 at 30. It argues that Sergeant Tolliver's earliest protected activity was the complaint he filed with the Human Resources Department on June 15, 2022, *id.* at 29, and that the May 10, 2022, email to Captain Quigley-Vining could not constitute a protected activity because it "does not once mention

or imply race is at issue." Doc. 39 at 8. It also argues that the cat's paw theory does not apply to this case for the same reasons it argued above. *Id.* at 9.

Sergeant Tolliver argues that his email to Captain Quigley-Vining about Lieutenant Snider on May 10, 2022, constituted his first protected activity, which occurred before Chief Thurmond placed his promotion on hold. *See* Doc. 38 at 20–22. He argues that although his email did "not explicitly use the words discrimination or racial harassment, he did state that his work environment was becoming 'hostile,'" which is sufficient to put the City on notice of his discrimination claim. *Id.* at 21. He also argues that "whether Chief Thurmond was aware of [Sergeant] Tolliver's complaint to [Captain] Quigley-Vining is of no consequence because" the cat's paw theory applies to retaliation claims. *Id.* at 22–23. And he argues that the first act of retaliation occurred when Captain Quigley-Vining "alleged that she caught him sleeping" the day after receiving his email about Lieutenant Snider. *Id.* at 21–22.

The retaliation provision of Title VII prohibits an employer from "discriminat[ing] against" an employee because she "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e–3(a). "To establish a claim of retaliation, [a plaintiff] must prove that she engaged in statutorily protected activity, that she suffered an adverse action, and that the adverse action was causally related to the protected activity." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir.

2018). To establish causation, a plaintiff must prove "that the protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* (cleaned up). In other words, "a plaintiff must prove that had she not complained, she would not have been" subjected to the alleged discriminatory action. *Id.* A plaintiff may prove a retaliation claim using the convincing mosaic metaphor. *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1337–38 (11th Cir. 2023).

Sergeant Tolliver's retaliation claim fails because he cannot establish that the adverse action—his failure to receive a promotion—"was causally related to [a] protected activity." *Jefferson*, 891 F.3d at 924. As an initial matter, Sergeant Tolliver argues that his first protected activity was the May 10, 2022, email, but testified at his deposition that the basis for his retaliation claim was the June 15, 2022, complaint that he filed with the Human Resources Department. *See* Doc. 28-1 at 69–72. In any event, Sergeant Tolliver's May 10, 2022, email to Captain Quigley-Vining does not constitute a protected activity (opposition to an unlawful employment practice as prohibited by Title VII). *See* 42 U.S.C. § 2000e–3(a). The email complained only that the "situation is becoming almost hostile" because Lieutenant Snider is "very rude, disrespectful, and unprofessional." Doc. 28-1 at 185. Nothing in the email implicates an unlawful employment practice under 42 U.S.C. § 2000e–2, such as racial discrimination. Sergeant Tolliver's belief that he was being discriminated

against was not made clear until he filed his June 15, 2022, complaint with the Human Resources Department. Doc. 28-1 at 210.

In addition, the May 10, 2022, email was sent to Captain Quigley-Vining. *Id.* at 185. Even if the email constituted a protected activity, Sergeant Tolliver has not offered evidence that Chief Thurmond had notice of the email before placing his application on hold. *See Little v. United Techs.*, 103 F.3d 956, 959 (11th Cir. 1997) ("[I]n order to hold an employer responsible under Title VII for a hostile environment created by a supervisor or co-worker, a plaintiff must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action."). "Without any knowledge amongst the [employer] that [the plaintiff] engaged in protected activity, [the plaintiff] cannot show that the activity caused the adverse [action]." *Quigg*, 814 F.3d at 1245; *see Brown v. City of Opelika*, 211 F. App'x 862, 863–64 (11th Cir. 2006) ("To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." (cleaned up)).

Notably, Chief Thurmond disciplined Sergeant Tolliver on July 25, 2022, after Sergeant Tolliver had filed a complaint with the Human Resources Department. *See* Doc. 28-1 at 188, 193. But Sergeant Tolliver has presented no evidence that Chief Thurmond was aware of the complaint, nor, for the reasons stated above, has

he presented evidence that Chief Thurmond acted as the cat's paw for Lieutenant Snider or Captain Quigley-Vining such that any animus on their behalf may be imputed to him.

Additionally, one of the disciplines was the result of information submitted by Lieutenant Green, not Lieutenant Snider or Captain Quigley-Vining, based on conduct that occurred before the May 10, 2022, email. *See* Doc. 28-1 at 192–93 (sustaining an allegation from Lieutenant Green for Sergeant Tolliver's failure to respond to the scene of the accident on April 29, 2022). Sergeant Tolliver argues, without citation to the record, that Captain Quigley-Vining "instructed [Lieutenant] Green to write him up," Doc. 38 at 19, but evidence supporting such a theory is not in the record.

Viewing all the evidence in the light most favorable to Sergeant Tolliver, a reasonable jury could not find that the City retaliated against him. Accordingly, the City's motion for summary judgment on Sergeant Tolliver's retaliation claim in Count A is **GRANTED**.

## IV.   CONCLUSION

For the reasons explained above, the City's motion for summary judgment, Doc. 29, is **GRANTED**.

**DONE** and **ORDERED** this 11th day of June, 2025.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE